**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RASHAD PHILLIP SCOTT, | Case No.: 16-cv-1175-WQH-AGS |
| Petitioner, | |
| v. | **ORDER** |
| W.L. MONTGOMERY and KAMALA D. HARRIS., | |
| Respondents. | |

HAYES, Judge:

The matter before the Court is the Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 by a Person in State Custody (ECF No. 1) (the "Petition") filed by Petitioner Rashad Phillip Scott on May 12, 2016. The Petition names W.L. Montgomery and Kamala D. Harris as Respondents. Pet. at 1. On September 13, 2016, Montgomery filed an Answer to the Petition for Writ of Habeas Corpus. (ECF No. 10). On December 16, 2016, Scott filed a Traverse (ECF No. 19.)

I.    **Background**

   A.    **The Incident**

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Parke v. Raley*, 506 U.S. 20, 35–36 (1992) (holding that findings of historical fact, including inferences properly drawn from

those facts, are entitled to a statutory presumption of correctness).  The following facts are taken from the California Court of Appeal opinion[1]:

> Defendants [Dontaye Craig, Fredrick Roberson, and Rashad Scott] and Marlon Johnson were active members of the criminal street gang Emerald Hills, an affiliate of the Bloods gang.  Johnson had moved to Los Angeles, and on May 23, 2009, a Saturday during Memorial Day weekend, he drove to San Diego and met up with Defendants.  They spent their time together drinking and smoking marijuana.  That evening, Defendants and Johnson went to the Solola Apartment complex, where they had their photograph taken together (Solola photo).
>
> Early on May 24, 2009, near the closing time for bars, Johnson drove Defendants to the Gaslamp Quarter.  The Gaslamp Quarter is not claimed by a particular gang, but members from different gangs frequent the area.
>
> Johnson parked near the intersection of E Street and Fifth Avenue, and he and Defendants walked west on the north side of E Street.  They were conspicuous because they were not dressed in club attire.
>
> Craig, Roberson, and Scott wore black hooded sweatshirts (hoodies), and under his hoodie Scott wore a distinctive black, white, and green striped shirt.  Roberson also wore gloves and a gray baseball cap with an "SD insignia" on it.  Johnson wore a gray tee shirt and a du-rag.
>
> Richard Turner was a documented member of the criminal street gang West Coast Crips, a main rival of Emerald Hill.  At about 2:00 a.m. on May 24, Turner and some friends left Belo, a club on the north side of E Street.  Roberson and Scott, who were walking ahead of Craig and Johnson, encountered Turner's group.  Roberson and Scott were acting aggressively, and Johnson heard them say "multiple things" to Turner's group, but he could not make out the content.
>
> A witness saw three or four men walking west on E Street toward Belo.  The first two men in the group wore dark hoodies, and about four or five minutes before the shooting he heard one of them say, "What's that Emerald like, motherfucker?"  He also heard "a lot of gang language" and "different gang names."  The comments made this witness fear "something bad might happen."  Another witness also heard gang challenges, such as "Blood, what's brackin?" (Bloods), and "What's crackin?" and "Cuz" (Crips).
>
> Roberson and Scott continued walking west, and when Johnson and Craig got to Turner, he bumped into Johnson and said, "What did you say?"

---

[1] Scott and his co-defendants Dontaye Coleman Craig and Fredrick Dwayne Roberson were tried jointly and their appeals were consolidated.  *See generally*, ECF No. 11-42 at 2–3.

Johnson denied saying anything. According to Turner, Johnson grabbed his chain and displayed a gun. Turner smacked Johnson's hand and said, "Don't touch me." Turner pounded his fist into his hand and loudly said, "Let's get it on."

It was unclear how many people were with Turner, so Craig directed Johnson to fetch Roberson and Scott. Both Craig and Johnson caught up with them at the northeast corner of E Street and Fourth Avenue, and Johnson said he "was ready to go." Johnson and Craig crossed to the south side of E Street and headed east to get to Johnson's car. When Johnson reached the southwest corner of E Street and Fifth Avenue, he ran into a friend and stopped to chat. Roberson and Scott had also crossed to the south side of E Street and they joined Johnson and Craig. While Johnson was busy with his friend, Craig, Roberson, and Scott talked.

Turner's group had headed east on the north side of E Street, and someone in Defendants' group said, "There he go over there." At that point, Defendants returned to the north side of E Street. Johnson heard "a loud dispute" and followed Defendants.

Witnesses heard the exchange of more gang terms, such as "Uptown Emerald Hills," and, "This is Crip, this is Crip." Johnson saw Roberson and Scott together "backing into the middle of the street." Johnson grabbed Roberson, but Roberson "looked like he was ready to go," meaning "get active, fight." Roberson threw off his hoodie and sucker punched a member of Turner's group. A fight ensued in the street, which was crowded with club goers.

Johnson's attention then turned to Turner. Johnson approached Turner "about to fight," and two photographs taken during the incident show them facing each other and "posturing." Before they threw any punches, however, several gunshots rang out. A witness heard the shooter say, "I don't chuck 'em," which she took to mean in gang lingo, "I don't fight." When the shooting stopped, Defendants and Johnson ran to his car and fled to the Solola Apartment complex.

Turner was shot multiple times and seriously injured. Lakiesha Mason, a bystander celebrating her 21st birthday, was shot in the head and killed, and Willy Aldridge, another bystander, was shot in the back and seriously injured.

A black hoodie, a gray baseball cap with an "SD" insignia, and four .38–special–caliber bullet fragments were found at the scene. Roberson's DNA was found on the hoodie and the cap, and gunshot residue was found on the hoodie. When Roberson was arrested in August 2010, he had a baseball cap with an "SD" insignia that was nearly identical to the one found at the scene.

Johnson was indicted on the same charges as defendants, but he eventually agreed to plead guilty to voluntary manslaughter and admit to a gang allegation in exchange for his testimony. [Footnote omitted.] In addition to providing many of the facts recounted above, he identified Roberson and Scott in a video taken near Belo shortly before the shooting. Johnson also identified himself as squaring off against Turner in two photographs someone took during the fight. Johnson testified that when the photographs were taken, Roberson and Scott were standing to his left and Craig was standing to his left and slightly behind him. Shadowy figures near Johnson in one of the photos were Defendants, and it appeared that Craig's arm was extended.

Further, Johnson testified Roberson was not wearing either his hoodie or his cap when he returned to the car. Johnson identified the hoodie and cap found at the scene as the ones Roberson wore. When Johnson and Defendants reached his car, Johnson asked who did the shooting. Craig, who was in the front seat, was holding a gun and admitted he was the shooter.

Johnson's former girlfriend, Carmen Torres, testified Johnson was with her in the early morning hours of May 24, 2009. Johnson told her he went downtown with friends and "after the club, they got into an altercation and one of his friends started shooting." The only friend Johnson mentioned by name was Craig.

Tony Mallard testified that at his birthday party in October 2010, Craig told him he tried to shoot "a Crip dude" in the Gaslamp, and he accidentally shot a woman. Craig also told Mallard "he was going to let the other guys take the fall for him." Mallard asked Craig why he "parties every day," and Craig said "he partied like it might be the last time."

Candace Hosburg witnessed the events, mostly from the outside patio of a bar on the south side of E Street. She testified she heard a verbal altercation across the street. She looked over and saw three men, one of whom she later identified as Turner. He was "yelling something" and was "pretty hyped up." The two other men walked west toward Fourth Avenue. One of them was dressed in a gray shirt, jeans, and a du-rag, and the other was dressed in a black leather jacket and jeans.

Hosburg lost sight of the man in the leather jacket. She kept her eye on Johnson because she "just felt something was wrong." He crossed to the south side of E Street and headed east. He walked up to two men wearing black hoodies and standing by a tree in front of the patio. The three men talked for about a minute, and then crossed to the north side of E Street. The men wearing hoodies raised the hoods over their heads. A fight broke out between two groups, and people were throwing punches at each other.

She heard gunshots, but she did not see the shooter.

From the Solola photo, Hosburg identified Johnson as the man in the gray shirt and du-rag. She also identified Scott as one of the men standing by the tree and "one of the people who walked into the street with [Johnson]." She was asked, "The male with the striped shirt, does he look similar to the person you saw? Or you think that is the person you saw?" She responded, "That is the person that I saw." She was then asked, "So you're sure about that?," and she responded, "Yes." She identified Craig from the photo as looking similar to the man in the black leather jacket, based on his "build and his height."

Numerous witnesses observed the shooter, and their descriptions varied considerably. Craig's attorney referred to him as "some six-foot-three, 285 pounds." Several witnesses described the shooter as tall, up to 6 feet 3 inches tall, between 200 and 220 pounds, and wearing a black hoodie and jeans or dark pants. Other witnesses described the shooter as shorter, from 5 feet 8 to 10 inches tall, and "kind of chunky" or weighing approximately 170 pounds.

One witness testified the shooter wore a black hoodie and a baseball cap with an "SD" insignia, and as he ran off it appeared he was removing the hoodie. When presented with one of the photographs taken of Turner and Johnson preparing to fight, this witness testified the shadowy figure behind Johnson was the shooter, the figure Johnson identified from the photo as Craig. Another witness testified the shooter wore a "hooded sweatshirt," and it "[l]ooked like he had a hat on." [Footnote 5: One witness told an investigator that he thought Johnson was the shooter. At trial, however, this witness clarified that he thought Johnson was armed because "it looked like he was pulling up his pants" and "maybe [he] could have been reaching for a gun."]

San Diego Police Detective David Collins, a gang expert, testified Emerald Hills's primary activities included "narcotics, assaults, murder, pimping." He described several predicate offenses involving shootings by Emerald Hills gang members. [Footnote 6: In May 2005, Terrence Jarvis was convicted of shooting at a car driven by a rival gang member through Emerald Hills territory, and Tyree Shine was convicted of assault with a firearm. A one-year-old child was also in the car. When Jarvis was arrested a .38–caliber gun was found nearby. In April 2007, Jonathan Hensley was convicted of attempted murder while armed with a firearm, and Craig Phillip Nash was convicted of attempted murder. The victim, a minor and Crips gang member, came to San Diego to visit his girlfriend. She arranged for the victim to stay at an apartment, which unbeknownst to her was inhabited "with Blood gang members." Nash believed the victim was there

to "put a hit in on" him, and he decided to "do a preemptive strike." Hensley was called, and he arrived with a gun. As the victim tried to flee he was shot. In March 2008, Malcolm Jackson was convicted of possession of a firearm by a felon.] Further, [Detective Collins] testified Emerald Hills and the West Coast Crips have a "violent rivalry."

Detective Collins explained the importance of respect in gang culture. If a gang member feels disrespected, he must retaliate "to keep [his] status within the gang." It is "a clear sign of disrespect" for a rival gang member to "call out" the name of his gang. The calling out of a rival gang name is a "challenge," or "hit-up." If "you have a rival calling it out, you should step up and take care of business at that point, and that may mean either challenging them and backing them down, or, if you have to, beat them down or do whatever you have to do to show that . . . you are the number one gang." Gang members know a hit-up will cause "at bare minimum, a physical fight," and that fights often escalate, involve deadly weapons, and result in serious injury or death.

Further, gang members "travel in packs because there's security in numbers." They back up each other, and if a member fails to provide back up, at a "bare minimum, you're going to get what's called DP, or disciplinary punishment. Your own gang will come in and discipline you for failing to follow through in backing up the homies." The DP could be anything from "a beat down" to death.

Detective Collins was asked a hypothetical question with the facts of this case, and he explained it "would definitely promote the gang in the sense that [Defendants] have gone back after their rival. In a crowded street, . . . they've challenged that rival and they've taken that rival down through a shooting. The use of the gun is basically the ultimate power that a gang member can have in the sense of controlling someone." Guns are a status symbol in gang culture, and a member willing to use a gun "is going to have more status" because gun use "creates . . . fear and intimidation."

(Lodgment No. 11-42 at 4–12.)

## B. State Court Proceedings

On February 15, 2012, Scott and codefendants Roberson and Craig were charged by consolidated information with first degree murder (Cal. Penal Code § 187(a), attempted murder (Cal. Penal Code §§ 187(a), 667), and assault with a firearm (Cal. Penal Code § 245 (a)(1)). (ECF No. 11-27 at 26 – 27). The information alleged that Scott committed all three offenses in association with, and for the promotion of, a criminal street gang (Cal. Penal Code §186.22(b)(1)). *Id.* at 28–31. The information also alleged that Scott was a

principal in committing counts one and two and that at least one of the principals personally used a firearm during the commission of counts one and two (Cal. Penal Code §§ 12022.53(b)-(e)(1)). *Id.* at 29–30. Finally, the information alleged that Scott committed the offenses when he was a juvenile over the age of 16 (Cal. Welf. & Inst. Code § 707(d)(1)). *Id.* at 29–31.

Scott and his two codefendants were tried together. *See* ECF No. 11-28 at 63. On September 17, 2012, a jury found Scott guilty on all three counts. (ECF No. 11-31 at 157–161).[2] The jury also found the gang and gun allegations as to each count to be true. *Id.* On December 13, 2012, the trial court sentenced Scott to a prison term of 35 years-to-life. (ECF No. 11-32 at 232–233).[3]

Scott appealed his conviction to the California Court of Appeal, arguing that (1) there was insufficient evidence to prove he was involved in the fight which led to the shooting; (2) the trial court improperly allowed gang expert testimony; (3) the jury was improperly instructed; and (4) the accumulation of trial errors rendered his trial fundamentally unfair. (ECF No. 11-39 at 34–80). Petitioner further requested the appellate court review the trial court's in camera *Pitchess* hearings. *Id.* at 80–83. Finally, Scott joined in the arguments raised on appeal by his codefendants. *Id.* at 83.

While Scott's appeal was pending, the California Supreme Court decided *People v. Chiu*, 59 Cal. 4th 155 (Cal. 2014). There, the court held that, as a matter of law, there can be no aider and abettor culpability for first degree premeditated murder under the natural and probable consequences theory of aiding and abetting liability. *Chiu*, 59 Cal. 4th. at

---

[2] The jury also found Craig and Roberson guilty on all counts. (ECF No. 11-42 at 2). The court sentenced Craig to 11 years, eight months, plus 75 years-to-life. (ECF No. 11-32 at 3–4). Roberson, who also admitted two prior strike convictions, was sentenced to 20 years, plus 189 years-to-life. *Id.* at 5–6.

[3] The trial court sentenced Scott to 25 years-to-life on count one, plus 10 years consecutive for the gun allegation. (ECF No. 11-32 at 232). As to count two, the court imposed the upper term of nine years plus 25 years-to-life for the gun allegation. *Id.* at 233. Petitioner received the upper term of four years on count three, plus five years consecutive for the gang allegation. *Id.* The sentences on counts two and three were to run concurrent with the sentence imposed on count one. *Id.*

158–59. In light of the holding in *Chiu*, the Court of Appeal reversed Scott's first degree murder conviction and reduced it to second degree murder. (ECF No. 11-42 at 55). The Court of Appeal also reversed the 10-year gun enhancement imposed as to count one. *Id.* at 4. The court rejected Scott's other claims on appeal and ordered him resentenced in accordance with its opinion. *Id.*[4]

Scott filed a petition for review in the California Supreme Court on July 6, 2015. (ECF No. 11-43). In it, Scott argued there was insufficient evidence to support his convictions and that gang expert testimony was erroneously admitted. *Id.* On September 9, 2015, the California Supreme Court denied the petition without comment or citation. (ECF No. 11-44).

## II. Scope of Review

Scott's Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under the AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

---

[4] The appellate court ordered that, on remand, the trial court not impose a sentence greater than 35 years to life. (ECF No. 11-42 at 54).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes the it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75–76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts

[Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer*, 538 U.S. at 72.

## III. Discussion

Scott raises two claims in his Petition: (1) his due process rights were violated because there was insufficient evidence to support his convictions, and (2) his due process rights were violated by the admission of gang expert testimony. Pet. at 21–54. Montgomery contends that both claims must be denied because Petitioner has failed to establish that the state court's decision was contrary to, or an unreasonable application of, clearly established law. (ECF No. 10-1).

### A. Insufficient Evidence

In claim one, Scott contends that his due process rights were violated when he was convicted based on insufficient evidence. Specifically, Scott contends that there was insufficient evidence to establish that he was the shooter or that he aided and abetted the shooting or the fight. Pet. at 18–39. Scott raised this claim in his petition for review in the California Supreme Court, (ECF No. 11-43 at 7–9), and it was denied without comment or citation, (ECF No. 11-44). This Court therefore looks through to the last reasoned decision to address the claim: that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805–06.

#### 1. State Court Proceedings

At trial, the jury found Scott guilty of first degree murder based on the prosecution's theory that the murder was the natural and probable consequence of the fight involving Scott's codefendants and rival gang members (including Turner), and that Scott had participated or aided and abetted his cohorts in that fight. (ECF No. 11-42 at 2). As discussed above, while Scott's direct appeal was pending, the California Supreme Court held that there could be no aider and abettor culpability for first degree premeditated murder under the natural and probable consequences doctrine. *Chiu*, 59 Cal. 4th at 158–59. Accordingly, because the California Court of Appeal found (and the state conceded)

that no evidence presented at trial supported a finding that Scott was the shooter or aided and abetted in the shooting, his first degree murder conviction was erroneous.  (ECF No. 11-42 at 30, 55).

The Court of Appeal went on to conclude that there was sufficient evidence to support a finding of second degree murder based on evidence that Scott aided and abetted the fight and that Lakiesha Mason's murder was a natural and probable consequence of that fight.  *Id.* at 23, 31.  Accordingly, the Court of Appeal reduced Scott's first degree murder conviction to second degree murder.  *Id.* at 55.  The court stated, in relevant part:

> Defendants challenge the sufficiency of the evidence to support their convictions.
>
>> "'[]In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.[']  [Citation.]['"] [Citation.]  We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence.  [Citation.]  We may reverse for lack of substantial evidence only if []"upon no hypothesis whatever is there sufficient substantial evidence to support"[] the conviction.
>
> (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1508.)  Since we reverse Defendants' first degree murder convictions, we determine whether substantial evidence supports convictions for second degree murder, attempted murder, and assault with a firearm.
>
> [. . .]
>
> Scott contends, and we agree, that the evidence does not support a finding he was the shooter or that he directly aided and abetted the shooting.  The People apparently concede the point, by not addressing those theories as to Scott and focusing solely on his culpability under the natural and probable consequences doctrine.  (*See People v. Bouzas* (1991) 53 Cal.3d 467, 480.)
>
> Scott also challenges the sufficiency of the evidence to support a finding he aided and abetted the target crime of simple assault or public fight, for purposes of the natural and probable consequences doctrine.  He asserts he was "simply present."  He submits that this case is distinguishable from [*People v.*] *Medina*, [] 46 Cal.4th 913, [(2009)] because "there was no evidence [h]e participated in confronting or punching Turner or anyone with him, no evidence he mad-dogged, flipped a gang sign, hollered a gang name."

11

"'[W]hen a particular aiding and abetting case triggers application of the "natural and probable consequences" doctrine . . . the trier of fact must find that the defendant, act[ed] with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense; (3) by act or advice aided, promoted, encouraged or instigated the commission of the target crime.'" (*People v. Guillen* (2014) 227 Cal.App.4th 934, 993.) "'[I]n general neither the presence at the scene of a crime nor knowledge of, but failure to prevent [the crime], is sufficient to establish aiding and abetting its commission.'" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) The jury may, however, consider these factors in determining whether one is an aider and abettor, along with other factors such as "'companionship, flight, and conduct before and after the crime.'" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273.)

Scott ignores evidence that he and Roberson exchanged gang challenges with Turner's group near Belo several minutes before the shooting. Roberson and Scott were walking ahead of Craig and Johnson, and witness testimony shows that either Roberson or Scott said, "What's that Emerald like, motherfucker?" Further, this witness heard other gang terms, and another witness heard the exchange of Bloods and Crips terms. Johnson testified Roberson and Scott made comments and behaved aggressively when they passed Turner. Contrary to Scott's position, the trouble did not begin when Johnson encountered Turner's group, it escalated.

Further, Scott could have stayed on the south side of E Street after exchanging gang challenges with Turner's group, but after talking with Roberson and Craig he decided to return to the north side with them to confront Turner's group. Although there is no evidence Scott threw any punches, he stood next to Roberson, Craig, and Johnson, and backed them up. Detective Collins testified that gang members rely on back up from other gang members, and if a gang member failed to provide backup he would suffer disciplinary punishment, which could be anything from a beating to death. Additionally, after the shooting, Scott did not disassociate himself from Roberson, Craig, and Johnson. Rather, he ran with them back to Johnson's car and fled with them to the Solola Apartment complex. We are satisfied that substantial evidence supports a reasonable inference Scott aided and abetted his fellow gang members in the fistfight.

(ECF No. 11-42 at 15–16, 30–31).

## 2.    Applicable Law

The Supreme Court has held that the due process clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof

of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also Cavazos v. Smith*, 565 U.S. 1, 6 (2011) (per curiam). In reviewing sufficiency of evidence claims on federal habeas, courts must engage in a thorough review of the state court record and view the evidence in the "light most favorable to the prosecution and all reasonable inferences that may be drawn from this evidence." *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005) (citing *Jackson*, 443 U.S. at 319).

Furthermore, "[c]ircumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 1986) *amended on denial of reh'g*, 798 F.2d 1250 (9th Cir. 1986)). A petitioner faces a "heavy burden" when seeking habeas relief by challenging the sufficiency of evidence used to obtain a state conviction on federal due process grounds. *Juan H.*, 408 F.3d at 1275.

A petitioner's insufficient evidence claim must be examined "with reference to the elements of the criminal offense as set forth by state law." *Id.* Under California law, second degree murder is the "unlawful killing of a human being with malice aforethought, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder." *People v. Neito Benitez*, 4 Cal. 4th 91, 102 (Cal. 1992) (citing Cal. Penal Code §§ 187(a), 189). Malice may be either express or implied. Cal. Penal Code § 188. Express malice requires an intent to kill; implied malice does not. *See People v. Gonzalez*, 54 Cal. 4th 643, 653 (Cal. 2012). Malice is implied when a person "willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." *Id.* (citing *People v. Knoller*, 41 Cal. 4th 139, 152 (Cal. 2007)).

Furthermore, under well-settled principles of California law, a defendant is guilty for any crime that he aids and abets, as well as any additional offenses that are committed by a principal if those additional offenses are a "natural and probable consequence" of the crime originally aided and abetted. *People v. Prettyman*, 14 Cal. 4th 248, 261 (Cal. 1996).

13

Stated differently, an aider and abettor "is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed." *People v. Croy*, 41 Cal. 3d 1, 12 (Cal. 1985). For example, "if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault." *People v. McCoy*, 25 Cal. 4th 1111, 1117 (Cal. 2001).

As such, for liability as an aider and abettor to the original target offense, the trier of fact must find that the defendant aided, promoted, encouraged, or instigated the commission of the target offense with knowledge of the unlawful purpose of the perpetrator and the intent or purpose of committing, encouraging, or facilitating the commission of a predicate or target offense. *Prettyman*, 14 Cal. 4th at 262. For liability as an aider and abettor to a non-target offense, the trier of fact must also find that the defendant's confederate committed an offense other than the target crime and that the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant aided and abetted. *Id.*

The test for liability of an aider and abettor for collateral criminal offenses is case-specific, dependent upon "all of the facts and circumstances surrounding the particular defendant's conduct." *People v. Nguyen*, 21 Cal. App. 4th 518, 535 (Cal. Ct. App. 1993). Whether the crime actually committed by the defendant's confederate is a natural and probable consequence of the target offense is a factual question for the jury to resolve based on "all of the circumstances surrounding the incident." *Id.* at 531 (citing *Croy*, 41 Cal. 3d at 12, n.5).

### 3. Evidence Introduced at Trial

Johnson, who was originally a defendant in the case, agreed to testify in exchange for a plea agreement to which he pled guilty to voluntary manslaughter and admitted to a gang allegation, carrying a sentence of three to eleven years. (ECF No. 11-6 at 23–24). Johnson was a member of the Emerald Hills gang. *Id.* at 30–31, 65. He testified that Roberson, Craig and Scott were also Emerald Hills gang members. *Id.* at 26–27, 31, 65.

According to Johnson, on May 23, 2009, he met up with Craig, Roberson and Scott and they spent the day smoking and drinking. *Id.* at 33. That evening the group went to the Solola Apartments for a while and then went downtown. *Id.* Johnson identified a photo taken at the Solola Apartments that evening, depicting Johnson, Demeatrice Harris,[5] Roberson, Craig, and Scott. *Id.* at 33–34. Scott was wearing a striped shirt in the photo. *Id.* at 34. Craig was wearing a black shirt and Roberson was in a gray shirt and gloves. *Id.* Johnson testified that the group was wearing the same clothes when they went downtown, except that Scott and Roberson had put on dark jackets or hoodies, and Craig put on a patterned sweatshirt. *Id.* at 35–36, 58–59. The group arrived in the Gaslamp Quarter of downtown San Diego as the bars in the area were closing. *Id.* at 39.

At about 2:00 a.m., Richard Turner, a documented member of the West Coast Cripps street gang, and his friends left the nightclub Belo. (ECF No. 11-7 at 36–37). The West Coast Crips were a main rival of Emerald Hills. (ECF No. 11-12 at 106). As Turner and his group walked on the north side of E Street, they encountered Scott and Roberson, who were walking toward them, ahead of Craig and Johnson. (ECF No. 11-6 at 39). Scott and Roberson exchanged words with Turner. *Id.* Witnesses heard either Scott or Roberson say "What's that Emerald like, motherfucker." (ECF No. 11-8 at 75). Turner then also exchanged words with Johnson. (ECF No. 11-6 at 39). Witnesses also overheard comments including "What's brackin?", "What's crackin?", and "Cuz" and understood the comments to be "gang language."[6] (ECF No. 11-3 at 104–05; ECF No. 11-8 at 68–73). One witness, Michael Reynolds, testified that after hearing the exchange of gang terms, he felt "something bad might happen." (ECF No. 11-8 at 75).

---

[5] Harris was a member of Lincoln Park gang, an ally of Emerald Hills gang. (ECF No. 11-12 at 208). Both Lincoln Park and Emerald Hills are sets of the Bloods gang. *Id.* at 105.

[6] Detective Collins, who testified as a gang expert, stated that "brackin" is a term associated with Blood sets, while "crackin" and "cuz" are associated with Crip sets. (ECF No. 11-12 at 108–09). Detective Collins also stated that use of the term "what's brackin" by a member of a Blood set to member of a rival Crip set would be seen as a challenge. *Id.*

Another witness, Candace Hosburg, testified that shortly after the verbal altercation she saw two men who were part of the verbal altercation walk away from Turner, heading west on E Street. (ECF No. 11-9 at 132). Hosburg identified one of the men as Johnson. *Id.* at 143–44. Johnson walked back across the street and then headed east on E Street toward Fifth Avenue. *Id.* at 135. He walked up to two other males who were standing near a tree and started talking to them. *Id.* The two other males were wearing black hoodies, jeans, and T-shirts. *Id.* at 136. Their hoods were down. *Id.* at 137. One of them was wearing a striped shirt under his hoodie. *Id.* at 146. Hosburg identified him as Scott. *Id.* All three men then crossed the street and walked toward Fifth Avenue and E Street. *Id.* at 138. Two of the men, including Scott, put up their hoods. *Id.* Shortly thereafter, Hosburg turned around to see people throwing punches. *Id.* at 138–39. The fight moved from the northwest sidewalk to the southwest. *Id.* at 140. She heard gunshots and started running. *Id.*

### 4. Discussion

This evidence, when taken in the light most favorable to the prosecution, is sufficient to support a finding that Scott aided and abetted the street fight. Evidence supported the theory that Scott was involved in the initial verbal altercation with Turner and his cohorts. A reasonable jury could infer from the evidence that, after the verbal altercation between Turner's group and Craig and Johnson escalated, Scott and Roberson crossed the street to return to where Craig was in order to support their fellow gang members in anticipation of a fight. Johnson testified that when he "squared off" against Turner (in preparation for the fight), Scott was standing immediately to his left. (ECF No. 11-6 at 46–47). Shots rang out seconds later. *Id.* at 50.

Detective Collins, the gang expert, explained that a gang "hit up" is when one gang member challenges a rival gang member, typically by making a comment such as "Where are you from?". (ECF No. 11-12 at 149, 154–55). The rival gang member is expected to indicate the name of his gang. *Id.* at 113. At that point, there will often be a physical fight at minimum. *Id.* at 113–14. Collins testified that gang members are generally aware that

16-cv-1175-WQH-AGS

such fights can lead to deadly altercations, and are expected to back each other up. *Id.* A gang member's status in the gang depends on their willingness to fight for the gang. *Id.* at 109. A reasonable juror could view this evidence as support for the finding that when the verbal challenges were made by Scott and/or his codefendants to Turner and his cohorts, Scott was encouraging and facilitating the fight that followed. This, in conjunction with Scott crossing the street to join Craig and standing with his fellow gang members as the fight started, when viewed in the light most favorable to the verdict, is sufficient to support the conclusion that Scott aided and abetted the fight.

Scott contends that there was no evidence that he "threw any punches" or "mad-dogged, flipped any gang signs or yelled any gang names." (ECF No. 19 at 4–5). First, there is no need to prove Scott himself threw any punches or personally participated in the fight. As discussed above, in order to establish aiding and abetting liability, the prosecution only needed to show that Scott intended to, and did, encourage, facilitate or assist those who did participate. *See Prettyman*, 14 Cal. 4th at 262. Second, as discussed above and contrary to Scott's contention, there was evidence that he was involved in the verbal altercation, during which gang challenges were made. Scott relies on the testimony of Turner, who stated that he did not make any gang challenges and that none were made towards him. ECF No. 19 at 5 (quoting ECF No. 11-7 at 38). As noted above, however, there was testimony from other eyewitnesses that Scott and his companions did indeed exchange gang challenges prior to the fight. *See, e.g.,* ECF No. 11-3 at 104–05; ECF No. 11-8 at 68–75. This Court must view the evidence in the light most favorable to the verdict. *See Jackson*, 443 U.S. at 319.

Scott's reliance on *Juan H.* is misplaced. In that case, the Ninth Circuit held that there was insufficient evidence to establish the defendant shared his brother's intent to shoot a rival gang member, whom the brothers had confronted about shots fired into their house. *Juan H.*, 408 F.3d at 1277. During the confrontation, the defendant's brother pulled out a gun and shot and killed the rival gang member. *Id.* at 1267. The Ninth Circuit noted that, although the defendant stood behind his brother during the killing, he did not say or

16-cv-1175-WQH-AGS

do anything that could have been construed as encouraging the brother to kill the gang member. *Id*. at 1267, 1278–79. That is not the case here where, as discussed above, witnesses testified that Scott and/or his cohorts had exchanged gang challenges with Turner and other rival gang members prior to the fight. *See, e.g.*, ECF No. 11-3 at 104–05; ECF No. 11-8 at 68–75. In addition, evidence showed that Johnson crossed the street and approached Scott and Roberson just prior to the fight. (ECF No. 11-9 at 135). After the three talked for a few minutes, they crossed back to the north side of the street. *Id.* at 138. Scott and Roberson raised their hoodies and soon thereafter a fight broke out between two groups. *Id.* at 138–39. Looking at this evidence in a light most favorable to the prosecution, it was reasonable for the jury to infer that Scott aided, promoted, or encouraged his fellow gang members to get into a physical altercation with Turner and other rival gang members.

The Ninth Circuit's decision in *Mitchell v. Prunty*, 107 F.3d 1337, 1342 (1997) is similarly distinguishable. In *Mitchell*, the Ninth Circuit held that there was insufficient evidence that the defendant aided and abetted fellow gang members who shot and then ran over a victim with their car, killing him. 107 F.3d at 1342, *overruled on other grounds in Santamaria v. Horsley*, 133 F.3d 1242 (9th Cir. 1998). In *Mitchell*, there was no evidence that the defendant had encouraged or assisted the driver of the car by word or action. *Id.* The court stated that membership in a gang, in and of itself, was not proof of the intent required to establish the elements of aiding and abetting. *Id.* at 1342 ("[T]here is no proof that [defendant] said anything to the driver of the vehicle in the minutes between the shooting and the fatal U-turn."). Again, that is not the case here, where the record contains ample evidence to support the conclusion that Scott took specific steps to encourage, promote or assist in the fight prior to the shooting.

Finally, there was sufficient evidence to support the conclusion that the shooting was the "natural and probable cause" of the fight. Detective Collins testified that gang members are generally aware that fights following a gang "hit up" can lead to a deadly altercation. (ECF No. 11-12 at 113–14). He stated that, in gang culture, violence garners respect; the

18

more violent the person is, the higher their gang status. *Id.* at 109. Based on this evidence, a reasonable juror could conclude that the shooting was the natural probable consequence of a gang fist fight. *See People v. Medina*, 46 Cal. 4th 913, 922-26 (Cal. 2009) (concluding a rational juror could have found shooting was a reasonably foreseeable consequence of a gang assault); *People v. Gonzalez*, 87 Cal. App. 4th 1, 10-11 (Cal. Ct. App. 2001) (concluding that a shooting of rival gang member during a retreat from a fight was the natural and probable consequence of the gang fight); *People v. Godinez*, 2. Cal. App. 4th 492, 499-500 (Cal. Ct. App. 1992) (finding a fatal stabbing of a rival gang member either during or after a fistfight was a natural and probable consequence of the fight).

In conclusion, and for the foregoing reasons, viewing the entire record as a whole in the light most favorable to the verdict, a reasonable juror could find that Scott was guilty beyond a reasonable doubt of second degree murder, attempted murder, and assault. *See Jackson*, 443 U.S. at 319.

### B.    Testimony of Gang Expert

In ground two, Scott claims his due process rights were violated when the trial court allowed improper testimony of a gang expert, Detective Collins. Pet. at 40–45. Specifically, Scott contends that Collins improperly testified as to his opinion on the ultimate issue of foreseeability, an issue which should have been reserved for the jury. *Id.* at 41. Scott raised this issue in his petition for review to the California Supreme Court, which was denied without comment or citation. (ECF Nos. 11-43 and 11-44). As such, this Court looks through to the opinion of the California Court of Appeal, the last reasoned state court decision to address this issue. *See Ylst*, 501 U.S. at 805-06.

### 1.    Opinion of the California Court of Appeal

The California Court of Appeal rejected Scott's argument that Collins improperly testified as to his opinion on the ultimate issue of foreseeability, stating:

> Scott, joined by Roberson, contends Detective Collins's testimony improperly usurped the jury's role in determining whether the shootings were foreseeable, or a natural and probable consequences of the physical altercation. "'As a general rule, a trial court has wide discretion to admit or

exclude expert testimony.'" (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506.)

> "'[T]he admission of gang evidence over an . . . objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason.['] [Citation.]" [Citation.] Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. [Citations.] [¶] The People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." [Citation.] "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.[]' [Citation.] Accordingly, when evidence of gang activity or affiliation is relevant to motive, it may properly be introduced even if prejudicial.

(*People v. Garcia, supra*, 168 Cal.App.4th at p. 275; [*see also*] *People v. Gardeley* (1996) 14 Cal.4th 605, 617; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 [()"Expert testimony repeatedly has been offered to show the 'motivation for a particular crime, generally retaliation or intimidation' and 'whether and how a crime was committed to benefit or promote a gang.'"[)].)

In *People v. Olguin, supra*, 31 Cal.App.4th at p. 1371, the defendant objected to the following exchange with a gang expert: "'Q. Now, do you have an opinion as to a gang member's expectation of what will result from, let's say, a mutual yelling out of gang names or affiliations? [¶] A. Yes. [¶] Q. And what is that opinion? [¶] A. The gang member would expect a violent confrontation.'" The court held the officer's testimony did not exceed the permissible scope because it "focused on what gangs and gang members typically expect and not on [the defendant's] subjective expectation in this instance." (*Ibid.*)

Scott cites the following exchange during Detective Collins's testimony:

> Q. Based on your experience, do verbal arguments between rival gang members often turn into physical altercations?
> A. Yes, they do.
> Q. And taken a step further, do these physical altercations often turn violent and involved serious injuries or death?
> A. Yes.
> Q. And in these incidents, it is often that weapons are used during these verbal altercations that escalate?

A. Yes.

Q. From your experience, are gang members who are involved in physical fights aware that this action often results in serious injury or death?

[A.] Yes.

Scott submits that the testimony was "nothing more than a thinly veiled expression on an ultimate issue in this case, to wit, whether it was reasonably foreseeable (to . . . Scott) that a physical fight often results in serious injury or death." Detective Collins, however, did not testify about Defendants' subjective knowledge that gang warfare often turns deadly, he was testifying generally about the knowledge of gang members. The testimony is similar to that approved of in *People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1371. It is also similar to the gang expert testimony in *Medina, supra*, 46 Cal.4th at p. 918 [:] "When gangs have a disagreement, you can almost guarantee it's going to result in some form of violence, whether that be punching and kicking or ultimately having somebody shot and killed."[]. The evidence does not exceed the permissible scope of gang expert testimony. "It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes 'respect.'" (*People v. Olquin, supra*, 31 Cal.App.4th at p. 1384.)

Later in Detective Collins's testimony, the issue of whether Defendants were active gang members was addressed. Scott and Roberson do not dispute that Defendants' names could, of course, properly be used in that testimony. In conjunction with that evidence, the following exchange took place:

Q. . . . Do you have an opinion as to whether . . . Scott would have knowledge of Emerald Hills criminal street gang's criminal activity?

A. Yes. I believe he would be aware of them.

Q. And the same question in regards to . . . Roberson.

A. Yes.

Detective Collins also opined Craig would have knowledge of Emerald Hills's criminal activity.

Scott and Roberson complain that this testimony impermissibly went to their subjective knowledge. "An expert . . . may not testify that an individual had specific knowledge or possessed a specific intent." (*People v. Garcia, supra*, 153 Cal.App.4th at p. 1513, citing *People v. Killebrew* (2003) 103 Cal.App.4th 655, 658.) The People assert the testimony was more akin to objective knowledge than subjective knowledge because Detective Collins opined that Defendants would be aware of Emerald Hills' criminal street gang activity, rather than that they were aware of it.

On this record, we agree with the People. Detective Collins's testimony

was lengthy and he repeatedly discussed gang culture and psychology generally. He acknowledged he did not participate in the investigation of this case or interview any of the Defendants. The jury likely understood Detective Collins lacked knowledge as to what whether [sic] Defendants were actually aware of Emerald Hills's criminal activities.

Additionally, even if this testimony should have been excluded, reversal is unwarranted. A harmless error analysis applies to the admission of gang expert testimony. (*People v. Valdez, supra*, 58 Cal.App.4th at p. 511, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) "Under *Watson*, defendant must demonstrate a reasonable probability that a result more favorable to defendant would have been reached absent the error." (*People v. Lucas* (2014) 60 Cal.4th 153, 263.) Defendants' knowledge of Emerald Hills's criminal activities was but one factor relevant to foreseeability and culpability under the natural and probable consequences doctrine, and thus the evidence was not tantamount to an opinion of guilt. (*See People v. Valdez, supra*, at p. 509.) Detective Collins properly testified that Defendants were active members of Emerald Hills, the shootings were done for the benefit of the gang, and gang members generally know fistfights between rival gang members often escalate and turn deadly. It is not reasonably probable the jury would have found in favor of Defendants absent Detective Collins's opinion they would have knowledge of Emerald Hills's prior criminal activities.

(Lodgment No. 14 at 32-35.)

### 2. Discussion

First, to the extent Scott asserts the trial court's admission of the gang expert's testimony was in violation of California rules of evidence, his claim is not cognizable on habeas review and must be denied. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (holding that issues regarding state law are not cognizable on federal habeas corpus review and that it is not the province of the federal habeas court to re-examine state-court determinations on state-law questions).

"Evidence erroneously admitted warrants habeas relief only when it results in the denial of a fundamentally fair trial in violation of the right to due process." *Briceno v. Scribner*, 555 F.3d 1069, 1077 (9th Cir. 2009) (citing *Estelle*, 502 U.S. at 6 –68); *see also Holly v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Failure to comply with state rules of evidence is not necessarily a sufficient basis for granting federal habeas relief on due process grounds. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Jammal v.*

*Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters*, 45 F.3d at 1357. Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. *Jammal*, 926 F.2d at 920.

Moreover, the Ninth Circuit has noted that, in cases governed by the AEDPA standard of review, the Supreme Court has never held that "the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact." *Moses v. Payne*, 555 F.3d 742, 758-59 (9th Cir. 2009); *see also Duvardo v. Giurbino*, 410 Fed. Appx. 69, 70 (9th Cir. 2011) (noting that the Supreme Court "has never held that the admission of expert testimony on an ultimate issue to be resolved by the trier of fact violates the Due Process Clause"); *Waggoner v. Hernandez*, 393 F. App'x 449, 452 (9th Cir. 2010) ("To the extent that Waggoner is [arguing] that the expert's testimony invaded the province of the jury, Waggoner fails to cite any United States Supreme Court case holding that an expert may not offer an opinion regarding the ultimate issue to be decided by the trier of fact."); *Briceno*, 555 F.3d at 1077 (rejecting claim that expert's testimony that hypothetical robberies were gang-related was unconstitutional because "there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue"). "When there is no clearly established federal law on an issue, a state court cannot be said to have unreasonably applied the law as to that issue." *Holley*, 568 F.3d at 1098 (9th Cir. 2009) (citing *Carey v. Musladin*, 549 U.S. 70, 77 (2006)). Thus, Scott's claim fails under AEDPA.

## IV. Conclusion

The Petition (ECF No. 1) is DENIED.

Dated: July 26, 2018

Hon. William Q. Hayes
United States District Court

23